# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2024　　　　　Decided April 29, 2025

No. 23-7076

K.E.F.V., BY AND THROUGH HER NEXT FRIEND HORTENSE VICKERS,
APPELLANT

v.

ISLAMIC REPUBLIC OF IRAN,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03835)

*Grace W. Knofczynski* argued the cause for appellant. With her on the briefs were *Joshua D. Branson*, *Andrew E. Goldsmith*, *Jimmy A. Ruck*, and *Chase H. Robinett*.

*Garfield McIntyre*, Student Counsel, argued the cause as *amicus curiae* in support of the District Court's judgment. On the brief was *Thomas V. Burch*, appointed by the court.

Before: WALKER and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

2

WALKER, *Circuit Judge*: Iran provided material support for the Taliban attack that killed thirty Americans, including a Navy special forces operator named Kraig Vickers. His family then sued Iran. That suit is expressly authorized by the Foreign Sovereign Immunities Act.

Most of the Vickers family prevailed in the district court. It awarded damages to compensate them for, among other things, Vickers' enduring absence from their lives. But the district court dismissed the claim of one of the Vickers children — K.E.F.V. — because she was born two months after her father's death.

That dismissal finds no support in the text of the FSIA. Nor does it comport with well-established principles of state tort law. Regardless of when K.E.F.V. was born, she is Kraig Vickers' daughter; she has been deprived by Iran of his comfort and society; and she is entitled to compensation for that injury.

We therefore reverse the district court.

**I**

On a March night in 2010, a SEAL Team flew deep into Taliban territory, toward a remote valley in the Hindu Kush. With no place to land their helicopters, the team rappelled into a gorge and crossed rugged mountains for more than six hours in the dark. Finally, they reached the compound of their high-value target, a Taliban commander who had already killed multiple Americans and who was expected to kill again soon.[1]

---

[1] Eric Blehm, *Fearless: The Undaunted Courage and Ultimate Sacrifice of Navy SEAL Team SIX Operator Adam Brown* 199-213 (2012).

3

In the ensuing firefight, a thirteen-year veteran from Kokomo named Kraig Vickers held his position, even after being shot. He deployed a grenade and exchanged gunfire from an exposed rooftop to cover the rescue of a mortally wounded teammate. For his courage in "complete disregard for his own safety" while "under effective enemy fire," Vickers was awarded the Silver Star. Kraig M. Vickers Silver Star Citation, https://perma.cc/U3EK-GDRD.

The next year, Vickers died on a similar mission, when the Taliban shot down a CH-47 Chinook helicopter carrying thirty U.S. service members, seven Afghan commandos, one civilian interpreter, and one U.S. military working dog. The shot that killed them was fired with a type of rocket-propelled grenade often produced in Iran and supplied by its government to the Taliban. Five days away from his thirty-seventh birthday, Vickers left behind a widow and three children, including a daughter born two months after his death.

The Vickers family and more than a hundred other plaintiffs sued Iran over its material support for eleven terrorist attacks. Their claims relied on the Foreign Sovereign Immunities Act, which creates liability in federal court against a state sponsor of terrorism that provides material support for certain extrajudicial killings. *See* 28 U.S.C. § 1605A(a), (c). Among the damages sought was "solatium" — solace for loss. *Id.* § 1605A(c).

Iran was properly served. It failed to appear. The plaintiffs then moved for a default judgment.

The FSIA imposes a heightened bar for default judgments. A plaintiff must establish "his claim or right to relief by evidence satisfactory to the court." *Id.* § 1608(e). So the

4

district court developed a case-management plan to evaluate each plaintiff's claim.

First, the district court held a three-day evidentiary hearing and concluded that Iran was a state sponsor of terrorism that had provided material support for each of the eleven attacks at issue. Next, the district court determined damages for twenty-three plaintiffs. Then, the district court appointed several special masters to recommend damages for the remaining ninety plaintiffs, including the Vickers family.

The special master recommended awarding solatium to each member of the Vickers family — $8 million for Vickers' wife, $5 million for the Vickers' two oldest children, and $2.5 million for their youngest daughter, known here as K.E.F.V.

The district court adopted nearly all the special masters' recommendations. But it "regretfully" dismissed K.E.F.V.'s claim. *Cabrera v. Islamic Republic of Iran*, Nos. 19-3835, 18-2065, 2023 WL 3496303, *7 (D.D.C. May 16, 2023). It held that she cannot recover solatium because she was born two months after the attack that killed her father. *Id.*

K.E.F.V. appealed.[2] We appointed Thomas Burch of the University of Georgia School of Law Appellate Litigation Clinic as an amicus to defend the district court's judgment.[3]

---

[2] Our review is de novo because the district court's holding that K.E.F.V. lacks standing to seek solatium was based on a pure question of law.

[3] Amicus was assisted by Student Counsel Garfield McIntyre. The court thanks Amicus and Student Counsel for their able advocacy.

5

**II**

The terrorism exception to the Foreign Sovereign Immunities Act creates subject matter jurisdiction and a private cause of action for certain claims against state sponsors of terrorism. 28 U.S.C. § 1605A(a), (c). It provides that a "foreign state" is "liable" when:

1. "the foreign state was designated as a state sponsor of terrorism"
2. at the time of a "personal injury or death"
3. "that was caused by an . . . extrajudicial killing . . . or the provision of material support or resources for such an act,"
4. and the claimant is "a national of the United States."

*Id.*

K.E.F.V. has satisfied those statutory elements. She is an American citizen. Her father's "death" was "caused by" an "extrajudicial killing." And Iran is a "state sponsor of terrorism" that provided "material support" for the attack that killed him. Therefore, K.E.F.V. has established Iran's liability.[4]

The question of remedy, however, remains. When its elements are satisfied, the FSIA makes available "economic

---

[4] The FSIA "instructs federal judges to find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). But that does not mean judges should search outside the statute when the relevant law is the statute's plain text. To find that text is to find the law.

6

damages, solatium, pain and suffering, and punitive damages." *Id.* § 1605A(c).

The remedy K.E.F.V seeks is solatium. It "began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 2018)). And in some circumstances, it can include the loss of a sibling. *Id.*

To calculate solatium, a court considers two factors. The first is the "injury to the feelings" of a family member caused by the circumstances of the decedent's death. *Id.* The second is the loss of the "decedent's comfort and society." *Id.* When the plaintiff is the daughter of the decedent, that second factor in effect asks: "What is it like for her to live without her father?"

### III

K.E.F.V. was not yet born when Iran helped the Taliban kill her father. But because she was born two months later, the Foreign Sovereign Immunities Act's terrorism exception allows her to recover solatium for the loss of her father's comfort and society.

### A

The FSIA does not expressly provide for after-born plaintiffs to recover solatium. But neither does it expressly preclude their recovery. And though one could argue that such silence in the FSIA invites federal courts "to craft a body of federal common law," this court's precedents don't allow it. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C.

7

Cir. 2018). Instead, we are obliged by precedent to "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Id.*

That instruction does not require us to supplant the FSIA's elements by importing state tort law wholesale into the FSIA's private cause of action.[5] Nor does that instruction foreclose reliance on state statutory law, such as wrongful death statutes. Though our precedents speak of the "common law," *id.*, "the language of an opinion is not always to be parsed as though we were dealing with the language of a statute," *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (cleaned up). When considering state tort law in a case about the FSIA, there is no reason to distinguish between state common law and state statutory law.

The upshot is that we must look for analogues within all types of "well-established" state tort law to provide guideposts for whether solatium is available to K.E.F.V. *See Fraenkel*, 892 F.3d at 353. And for two reasons, wrongful death statutes provide the best analogue. First, solatium is commonly awarded as a remedy in wrongful death suits. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29-32 (D.D.C. 1998) (charting the rise of solatium as a remedy in wrongful death actions). Second, the FSIA's private cause of action is itself akin to a wrongful death statute.

---

[5] *See M.M. v. Islamic Republic of Iran*, 708 F. Supp. 3d 22, 46 (D.D.C. 2023) ("eligible plaintiffs pressing claims under § 1605A(c) need not *also* establish their ability to recover under some other source of substantive law"). *But see Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 137 (D.D.C. 2018) (section 1605A(c) "does not provide guidance on the substantive bases for liability to determine Plaintiffs' entitlement to damages").

8

K.E.F.V. points to cases from thirteen jurisdictions, each interpreting wrongful death statutes to allow children who were in utero at the time of a parent's death to recover on the same basis as children who were already born. Appellant Br. at 22-26. They span 130 years and firmly establish that children born after the death of a parent can recover for that parent's wrongful death:

- In *Nelson v. Galveston, Harrisburg & San Antonio Railway Co.*, the Texas Supreme Court permitted a child born after his father's death to avail himself of Texas's wrongful death statute. 14 S.W. 1021, 1023-24 (Tex. 1890). The court explained that the wrongful death statute provided a "right of action . . . to all of the surviving children of the deceased." *Id.* That included the plaintiff, who, "although unborn at the time of his father's death, was in being, and one of his surviving children." *Id.*; *see also id.* (adopting from inheritance law the principle that "a posthumous child must be considered in the same situation, and entitled to the same benefits, as one born during the life of its father" (cleaned up)).

- In *Quinlen v. Welch*, a child born one day after her father was run over by a train was permitted to bring an action under New York's dram shop act for her father's death. 23 N.Y.S. 963, 963, 965 (N.Y. Gen. Term 1893). The court recognized that an "unborn child, if subsequently born alive, if deprived of a parent, suffers in its means of support equally with the

9

children that were living at the time of the decease of such parent." *Id.* at 964.

- In *State ex rel. Niece v. Soale*, a child was born two months after his father was shot and killed in a drunken quarrel. 74 N.E. 1111, 1111 (Ind. App. Ct. 1905). The child sued the supplier of the alcohol under Indiana's dram shop act. *Id.* The Indiana intermediate appellate court reversed the trial court, holding that "no distinction between the rights of a posthumous child and one born during the lifetime of the parent should be made." *Id.* at 1113.

- In *Herndon v. St. Louis & San Francisco Railroad Co.*, a child born about four months after his father's death brought an action under Oklahoma's wrongful death statute. 128 P. 727, 727 (Okla. 1912). The Oklahoma Supreme Court had "no doubt" that "the child . . . unborn at the time of his father's death, but later born alive, is to be considered under our laws as an existing person at the time of his father's death, and therefore a beneficiary and entitled to . . . any recovery of damages for the wrongful death of its father." *Id.* at 730.

- In *Bonnarens v. Lead Belt Railway Co.*, the Missouri Supreme Court considered a wrongful death action stemming from a railroad accident. 273 S.W. 1043, 1044 (Mo. 1925). Although the court ultimately reversed the jury's verdict, it found "no merit in th[e] contention" that the "plaintiff, being a posthumous child, does not come within the terms of the statute

10

and is not entitled to prosecute this action." *Id.* at 1046.

- In *Chick Transit Corp. v. Edenton*, the Virginia Supreme Court of Appeals affirmed a verdict awarding damages to an after-born child whose father was killed in a car crash. 196 S.E. 648, 651-52 (Va. 1938). The court rejected as "not impressive" the defendant's argument that "nothing should be added for the child for its loss of a father's care, attention, and society" since the "child was born subsequent" to his father's death. *Id.* at 651. The court explained that the after-born plaintiff "will miss the solace and comfort usually provided by a father to his child no less by reason of the fact that he was born after his father was killed." *Id.*

- In *Boise Payette Lumber Co. v. Larsen*, the Ninth Circuit, applying Idaho law in a wrongful death case, affirmed an award of damages to an after-born son whose father died in a plane crash. 214 F.2d 373, 375, 379-80 (9th Cir. 1954). Testimony from the trial showed that the father's "death was a heavy loss to the . . . after-born son, not only from a financial standpoint but from the aspect of his society, which seems to be compensable in Idaho." *Id.* at 379.

- In *Ellis v. Humana of Florida, Inc.*, the Florida District Court of Appeal allowed a child born six weeks after his father's death to bring a wrongful death action. 569 So.2d 827, 828-29 (Fla. 5th DCA 1990). The court reasoned that an unborn child's

11

status as a survivor of the decedent is "inchoate at the time of the wrongful death" and "become[s] fully vested upon the occurrence of its live birth." *Id.*

- In *Marrero Artache v. Autoridad de Energia Electrica*, the District Court for the District of Puerto Rico held that a child born after her father died could bring a claim under Puerto Rico's wrongful death statute. 924 F. Supp. 346, 348-51 (D.P.R. 1996). The court rejected the defendant's argument that "as a posthumous child," the plaintiff had not "sufficiently developed emotional bonds with her father the severing of which may be judicially redressed." *Id.* at 349. On the contrary, the court held that a "jury could reasonably find that she has and will suffer emotional distress as a result" of the loss of "a biological parent who she will never know." *Id.* at 351.

- In *Quinn v. Pennsylvania Department of Transportation*, a child who was sixteen weeks in-utero when his father died in a car accident sued Pennsylvania for improperly positioning a highway guardrail. 719 A.2d 1105, 1107, 1110 (Pa. Commw. 1998). Drawing on the laws of intestate succession, the Pennsylvania intermediate court concluded that the after-born child "should be treated as if born before his father's death and, as a result, possessed of

12

full rights of recovery allowed under the Wrongful Death Act." *Id.* at 1111.[6]

- In *In re Estate of Davis*, the Mississippi Supreme Court held that "a preborn child who is viable at the time of a relative's death and is ultimately born alive, is 'living' such that he or she can be a wrongful death beneficiary under the law." 706 So.2d 244, 247 (Miss. 1998).

- In *deVente v. Flora*, the Georgia Court of Appeals affirmed a declaratory judgment holding that an after-born child was her deceased father's "sole heir and potential wrongful death claimant." 684 S.E.2d 91, 92 (Ga. App. 2009). Although the child was in utero at the time of her father's death, her claim presented "a classic wrongful death scenario — a living child seeking to recover for the death of her father." *Id.* at 93.

- In *Boland v. Estate of Smith*, the Vermont Supreme Court held that a child born twenty-eight weeks after her father's death could bring a claim under

---

[6] The Pennsylvania Supreme Court later criticized *Quinn* for awarding non-pecuniary damages in a suit against the Pennsylvania government because such damages were barred by sovereign immunity. *Department of Public Welfare v. Schultz*, 855 A.2d 753, 756 (Pa. 2004) (holding that "a parent may not recover non-pecuniary losses from the Commonwealth resulting from the death of a child because such action is barred by" sovereign immunity). But the court did not discuss *Quinn*'s holding that after-born children should be treated like children who were born at the time of a parent's death.

13

Vermont's dram shop act. 237 A.3d 723, 725, 728 (Vt. 2020). The court reasoned that in a case where a "decedent had one child born prior to his death and another child," like K.E.F.V., "born after his death, it would be unfair . . . for one sibling to have a cause of action and the other sibling to have no remedy when they are equally injured in loss of support." *Id.* at 728.

Amicus responds that most of the cases K.E.F.V. cites did not provide for emotional damages. Amicus Br. at 19. That observation is correct, but beside the point. Congress has already determined that solatium is available under the FSIA. 28 U.S.C. § 1605A(c). Thus, the wrongful death cases K.E.F.V. cites are important not for the types of damages they allow, but because they permit after-born plaintiffs to recover whatever types of damages their respective statutes allow — on an equal footing with already-born children.

Amicus argues these thirteen cases do "not rise to the level of 'well-established statements of common law.'" Amicus Br. at 20. And it is true that they do not form a majority of jurisdictions. But it appears that most jurisdictions have not had the opportunity to decide the question of after-born recovery. More important is the consensus of the jurisdictions that have. Of the wrongful death cases that were (1) brought to our attention by the parties and (2) considered after-born plaintiffs, *all* declined to distinguish between in-utero and already-born children.[7] *See* Oral Arg. Tr. 23.

---

[7] K.E.F.V. also points to intentional infliction of emotional distress, loss of parental consortium, and § 869 of the Restatement (Second) of Torts as potential common law analogues justifying solatium for after-born plaintiffs. We need not decide whether those sources of law support K.E.F.V.'s ability to recover because K.E.F.V. has

14

**B**

The district court gave two reasons for its decision.

*First*, the district court said that terrorist attacks are not "directed" at unborn family members. *Cabrera v. Islamic Republic of Iran*, Nos. 19-3835, 18-2065, 2023 WL 3496303, *7 (D.D.C. May 16, 2023). That may be true, and perhaps that fact would be dispositive if solatium covered only the "injury to the feelings" of a family member caused by the circumstances of the decedent's death. *Fraenkel*, 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29). But solatium also covers the loss of the decedent's "comfort and society." *Id.* (quoting *Flatow*, 999 F. Supp. at 29). And because Iran took from K.E.F.V. the comfort and society of her father, K.E.F.V. can recover solatium from Iran.

That recovery may well be smaller than if K.E.F.V. had also suffered mental anguish at the time of her father's death as a result of terrorists "direct[ing]" an attack at her. *Cabrera*, 2023 WL 3496303 at *7. If so, K.E.F.V. will recover less solatium damages than her older siblings recovered. For example, when awarding damages to a plaintiff named C.C.V., who was two months old when her father died in the same helicopter attack as K.E.F.V.'s father, the district court reduced C.C.V.'s damages from the baseline of $5 million to an award of $3 million because she was too young to comprehend her father's death contemporaneously. *Id.* at *10-11.

---

demonstrated a "well-established" principle that state wrongful death statutes would allow after-born plaintiffs to recover on the same basis as already born plaintiffs, and we find that principle persuasive.

15

But just as C.C.V.'s age was no reason to dismiss C.C.V.'s suit, K.E.F.V.'s age is no reason to dismiss K.E.F.V.'s suit. Both have been forced to grow up without the "love, affection, care, attention, companionship, comfort and protection" that their fathers would have provided. *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 585 (1974), *superseded by statute*, Longshore and Harbor Workers' Compensation Act, Pub. L. No. 92-576, 86 Stat. 1263; *see also Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 23 (D.D.C. 2019) (there's "little difference between a child born two days after the attack and a child who was only [a] month old at the time of the attack"). There is no rational basis to distinguish between these two children born just four months apart.

*Second*, the district court said that allowing plaintiffs like K.E.F.V. to recover would create "a potentially unlimited class" that "could remain open for decades after a terrorist attack." *Cabrera*, 2023 WL 3496303 at *7 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15 (D.D.C. 2012)). But that concern is easily mitigated by limiting recovery to plaintiffs who are in utero at the time of a terrorist attack and born later.[8]

---

[8] *Compare, e.g.*, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 111, 113 & n.3 (D.D.C. 2000) (solatium for child seven months in utero when her father was kidnapped), *and Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 237, 239, 241 (S.D.N.Y. 2003) (solatium for child who was three months in utero on 9/11), *with Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 57-60, 76 (D.D.C. 2011) (no solatium for child born 12 years after his mother was injured in terrorist attack), *and Davis*, 882 F. Supp. 2d at 11, 15 (no solatium for plaintiffs born years after Beirut barracks bombing). *But see, e.g.*, *id.* (no solatium for two plaintiffs in utero at time of Beirut bombing).

16

Accordingly, the district court erred in holding that K.E.F.V. lacked standing to recover solatium. We conclude that children who are in utero at the time a parent is killed in a terrorist attack and who are later born may seek solatium under the FSIA.

## IV

When Iran helped the Taliban kill Kraig Vickers, K.E.F.V. lost her father. And because the rest of her family can successfully sue Iran, she can too. There is no rational reason why recovery should turn on the mere happenstance of being in utero or ex utero at the time of the Taliban's attack.

We therefore reverse the decision of the district court and remand for proceedings consistent with this opinion.

*So ordered.*